UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CECIL COLEMAN,

               Plaintiff,

vs.                           Case No.  2:08-cv-780-FtM-29SPC

VICTOR PRESCITI, DOUGLAS COLEMAN,
and LEONARDO NAVARRO, individually,

               Defendants.

_____

**OPINION AND ORDER**

**I. Status**

This matter comes before the Court upon review of the Motion for Summary Judgment (Doc. #122, Mot. SJ), filed on behalf of Defendants Coleman, Navarro, and Presciti on September 1, 2011. Defendants submit supporting exhibits (Docs. #122-1, Defs' Exhs. A-O; #122-2, Defs' Exhs. P-Y), including <u>inter</u> <u>alia</u>: the use of force reports prepared by Defendants Presciti and Navarro on the day of the incident, December 16, 2005 (Exh. A); Declarations of Defendants Presciti and Navarro (Exhs. B, C); Deposition of Defendant Navarro (Exh. D); Declaration of Nurse Tomaszewski who examined Plaintiff immediately after the use of force (Exh. E); Deposition of Defendant Coleman (Exh. F); Declaration of Defendant Coleman (Exh. G); Declaration of Officer Kozlowski (Exh. H); disciplinary report log number 510-05268 issued against Plaintiff stemming from use of force (Exh. I) and guilty finding related thereto (Exh. K); excerpt from Plaintiff's medical documents while

in DOC (Exhs. K-M); Declaration from the director of dental services for the Department of Corrections, Thomas Shields, and photograph of Plaintiff's face and mouth showing missing teeth (Exh. N); Deposition of Plaintiff (Exh. P); Plaintiff's medical records from Shand's Hospital dated July 2007 (Exh. Q); expert witness report prepared by Eugene Atherton finding use of force was reasonable under the circumstances (Exh. R); Plaintiff's response to Defendants' first set of interrogatories (Exh. S); Declaration of C.A. Sames of the Jacksonville Sheriff's Office, who arrested Plaintiff in October 2007, and the arrest report related thereto (Exh. T); 2008 judgment finding Plaintiff guilty of felony battery, fleeing or attempting to elude a law enforcement officer, driving with suspended licence, possession of ecstasy, introduction and/or possession of contraband into county detention facility, giving false name or identification, and resisting officer without violence (Exh. U); Plaintiff's inmate grievance, dated March 2010, and response thereto indicating that Plaintiff does not require a wheelchair or a medical orderly because he is capable of walking, based upon correspondence from the doctor in the institutional medicine program opining that Plaintiff can walk and requires no special assistance (Exh. W); Plaintiff's DOC medical form dated February 15, 2008, showing that Plaintiff refused to have an MRI of the spine and refused a neurological exam (Exh. W); response to inmate grievance dated June 28, 2010, showing that no pass for a

wheelchair was issued to Plaintiff because his paralysis is subjective and no physical findings support his purported paralysis (Exh. X); and, Declaration of Doctor W. Rummel (Exh. Y). Defendants also refer the Court to the fixed-wing video footage that was previously submitted under seal on August 25, 2010, which captured the use of force from three different angles.[1]

Plaintiff filed a response (Doc. #124, Response) in opposition to the Defendants' Motion for Summary Judgment and attached supporting exhibits (Docs. #124-1 through #124-3; Pl's Exhs. A-D), including, inter alia, a copy of a portion of Plaintiff's Deposition (Doc. #124-1), a copy of the fixed-wing video that captured the use of force,[2] Charlotte Correctional's written reprimand of Defendant Presciti (Doc. #124-2), the Inspector General's Report related to the incident sub judice (Doc. #124-2), and Defendant Presciti's letter of resignation dated August 30, 2006 (Doc. #124-3). Pursuant to the Court's Order, Defendants were

---

[1]At the outset, the Court notes that the Defendants' footage from the fixed-wing video that appears first on the disk captures more of the use of force incident than the other two fixed-wing videos. Neither Defendants' video, nor Plaintiff's video have audio.

[2]The Court notes that the fixed-wing video submitted by Plaintiff is duplicative of the first video submitted by Defendants. The Court prefers the Plaintiff's copy of the footage, however, because of the timer that appears on the bottom of the footage and the ability to zoom-in. Therefore, the Court will cite to this video as Pl's Video. Additionally, any citations to the record herein will cite to the page number that appears on the top of the page according to the Court's Case Management Electronic Filing System, not to the page number assigned by either party.

permitted to file a limited brief in Reply (Doc. #128, Reply). This matter is ripe for review.

## II.  Background

Cecil Coleman, an inmate in the custody of the Florida Department of Corrections, initiated this action by filing a pro se Civil Rights Complaint pursuant to 42 U.S.C. § 1983 on October 2, 2008.  On November 1, 2010, counsel entered his appearance on behalf of Plaintiff.  Plaintiff, through counsel, is proceeding on his Third Amended Complaint (Doc. #109, Third Complaint), filed May 5, 2011, against Defendants Victor Presciti, Douglas Coleman, and Leonardo Navarro, in their individual capacities.

The Third Complaint alleges that Defendants violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment while Plaintiff was incarcerated in Charlotte Correctional Institution.  Third Complaint at 6.  In particular, the Third Complaint alleges that, on December 16, 2005, Defendants Navarro and Presciti punched and kicked Plaintiff when he refused to allow the correctional officers to borrow his personal wheelchair to transport another inmate.  Third Complaint at 2. Plaintiff alleges that Defendant Sergeant Coleman, as the "supervisory officer," "orchestrated" the use of excessive force. Id. at 4.  Plaintiff also alleges that each of the individual Defendants could have intervened to stop the excessive application of force, but did not.  Id. at 5.  As relief, Plaintiff seeks

-4-

compensatory and punitive damages, prejudgment interest on all economic losses and post-judgment interest, and attorney's fees pursuant to 42 U.S.C. § 1988 and costs of litigation. Id. at 7.

### III.  Applicable Law

"Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011)(internal quotations and citations omitted). See also, Fed. R. Civ. P. 56(c)(2). "The moving party may meet its burden to show that there are no genuine issues of material fact by demonstrating that there is a lack of evidence to support the essential elements that the non-moving party must prove at trial." Moton, 631 F.3d at 1341 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The standard for creating a genuine dispute of fact requires the court to "make all *reasonable* inferences in favor of the party opposing summary judgment," Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)(en banc)(emphasis added), not to make all *possible* inferences in the non-moving party's favor.

To avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion "bears the burden of persuasion" and must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, and/or admissions, and "set forth specific facts showing that there is a

genuine issue for trial." Beard v. Banks, 548 U.S. 521, 529 (2006)(citations omitted); Celotex, 477 U.S. at 322; Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1225 (11th Cir. 1999). If there is a conflict in the evidence, the non-moving party's evidence is to be believed and "all justifiable inferences" must be drawn in favor of the non-moving party. Beard, 548 U.S. at 529 (citations omitted); Shotz v. City of Plantation, Fl., 344 F.3d 1161, 1164 (11th Cir. 2003). "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" Cuesta v. School Bd. of Miami-Dade County, 285 F.3d 962, 970 (11th Cir. 2002) (citations omitted). Nor are conclusory allegations based on subjective beliefs sufficient to create a genuine issue of material fact. Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

In cases where there is video evidence, the Court accepts the video's depiction over the opposing party's account of the facts where the video obviously contradicts the version of the facts. Pourmoghani-Esfahni v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2010)(per curiam)(quoting Scott v. Harris, 550 U.S. 372, 380

(2007)).   Even where the entire series of events is recorded, video evidence is not obviously contradictory where it fails to convey spoken words or tone, or fails to provide an unobstructed view of the events.  Id.;  See also Logan v. Smith, No. 11-10695, 2011 WL 3821222 (11th Cir. Aug. 29, 2011)(unpublished).

### A.   Section 1983 Elements

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege: (1) defendants deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law.  Arrington v. Cobb County, 139 F.3d 865, 872 (11th Cir. 1998); U.S. Steel, LLC v. Tieco, Inc., 261 F.3d 1275, 1288 (11th Cir. 2001).  In addition, a plaintiff must allege and establish an affirmative causal connection between the defendant's conduct and the constitutional deprivation.  Marsh v. Butler County, 268 F.3d 1014, 1059 (11th Cir. 2001); Swint v. City of Wadley, 51 F.3d 988 (11th Cir. 1995); Tittle v. Jefferson County Comm'n, 10 F.3d 1535, 1541 n.1 (11th Cir. 1994).  A defendant who occupies a supervisory position may not be held liable under a theory of respondeat superior in a § 1983 action.  Monell v. Dep't of Soc. Serv., 436 U.S. 658, 690-692 (1978); Quinn v. Monroe County, 330 F.3d 1320, 1325 (11th Cir. 2003); Farrow v. West, 320 F.3d 1235 (11th Cir. 2003).

### B.  Eighth Amendment

The Eighth Amendment, which applies to the states through the Fourteenth Amendment, can give rise to claims challenging the excessive use of force. Thomas v. Bryant, 614 F.3d 1288, 1304-05 (11th Cir. 2010)(reviewing categories of claims under the Eighth Amendment). An excessive-force claim requires a two-prong showing: (1) an objective showing of deprivation or injury that is "sufficiently serious" to constitute a denial of the "minimal civilized measure of life's necessities"; and, (2) a subjective showing that the official had a "sufficiently culpable state of mind." Id. (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)(other citations omitted). It is the "unnecessary and wanton infliction of pain" caused by force used "maliciously and sadistically" for the very purpose of causing harm that constitutes cruel and unusual punishment. Whitley v. Albers, 475 U.S. 312, 322 (1986). Thus, where an Eighth Amendment claim is based upon allegations of excessive force, the question turns on whether the prison guard's "force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purpose of causing harm." Bozeman v. Orum, 422 F.3d 1265, 1271 (11th Cir. 2005). To determine whether force was applied "maliciously and sadistically," courts consider the following factors: "(1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of

force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them." Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999)(quotations and citations omitted). It must be noted that although the extent of the injury is a relevant factor in determining whether the use of force could plausibly have been thought necessary under the circumstances and may be an indication of the amount of force applied, it is not solely determinative of an Eighth Amendment claim. Wilkins v. Gaddy, ____ U.S. ____, 130 S. Ct. 1175, 1178 (2010)(per curiam). "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Id. at 1178-79.

Moreover, in the context of prison discipline, a distinction is made between "punishment after the fact and immediate coercive measures necessary to restore order or security." Ort v. White, 813 F.2d 318, 324-325 (11th Cir. 1987). When a prison's internal safety is of concern, courts conduct a more deferential review of the prison officials' actions. Williams v. Burton, 943 F.2d 1572, 1575 (11th Cir. 1991)(citations omitted). Indeed, "[t]hat deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to

prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline." <u>Whitley</u>, 475 U.S. at 322; <u>See</u> <u>also</u> <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979).

### IV.   Findings of Fact and Conclusions of Law

Based upon the record, the Court finds the following undisputed facts, which are construed in the light most favorable to Plaintiff.   The fixed-wing video captured the entire use of force incident.   Response at 3. Defendant Presciti approached Plaintiff's cell because he wanted to temporarily use Plaintiff's wheelchair to move a handicap inmate, who was located in the same quad as Plaintiff.   Third Complaint at 3;  Pl. Depo. at Doc. #124-1, pp. 16-17; Mot. SJ at 2; Response at 3; <u>see</u> <u>also</u> Pl's video at 7:31 p.m.   In the presence of Defendants Presciti and Navarro, Plaintiff wheeled himself out of his cell into the quad and moved himself to a seat affixed to one of the tables in the quad.[3]  Pl's video at 7:32:33 p.m.

While Plaintiff sat at the table, Defendant Navarro turned his back toward Plaintiff and began to push the wheelchair away. Plaintiff lunged from his seat toward Defendant Navarro's back and grasped the wheelchair refusing to let go.   Officer Presciti intervened and attempted to break Plaintiff's grasp on the

---

[3]The tables in the quad are round, metal, stationary tables with bench-like curved seats affixed to the table.

wheelchair.  Both Defendant Presciti and Plaintiff landed on the
concrete floor.  After applying some amount of force to Plaintiff's
arm, and two, one-second bursts of chemical agents to Plaintiff's
facial area, Defendants Navarro and Presciti successfully removed
the wheelchair from Plaintiff's grasp.  Plaintiff remained subdued
on the concrete floor on his stomach until other officers arrived
minutes later.  The duration of the use of force incident spanned
approximately one minute of time (from 7:33:27 p.m., when Navarro
turned his back on Plaintiff and began to remove the wheelchair, to
approximately 7:34 p.m., when Navarro and Presciti restrained
Plaintiff on his stomach on the ground).  See Pl's Video.

Other officers arrived and responded to the scene
approximately three minutes later at 7:37:48 p.m.  See id.
Defendant Sergeant Coleman arrived after Plaintiff was in handcuffs
and the use of force had concluded.  Pl's Exh. A, Plaintiff Depo.
at 33.  After the use of force, Plaintiff was escorted to the
shower to remove the chemical agents and Nurse Tomaszewski examined
him.

The evidence shows Plaintiff sustained no injuries, or at most
sustained bruised ribs.  Plaintiff was returned to his cell without
incident.  Plaintiff received a disciplinary report ("DR") for
unarmed assault stemming from the December 16, 2005 incident.  The
DR prepared by Defendant Presciti stated:

> ON 12-16-05 AT APPROXIMATELY 2210HRS I AM WRITING THIS
> DISCIPLINARY REPORT ON INMATE COLEMAN, CECIL DC #J04634

> FOR OTHER ASSAULT.  AT APPROXIMATELY 1933HRS, OFFICER
> NAVARRO AND I WERE CONDUCTING SHOWERS IN G DORM WING #1.
> AFTER HAVING INMATE COLEMAN SIT AT A TABLE IN THE QUAD TO
> UTILIZE HIS WHEELCHAIR FOR ANOTHER HANDICAPPED INMATE,
> INMATE COLEMAN BECAME ARGUMENTATIVE AND DISORDERLY BY
> YELLING AND LUNGING TOWARD OFFICER NAVARRO, GRABBING
> AHOLD [sic] OF THE WHEELCHAIR AND REFUSING TO LET GO.
> FORCE HAD TO BE USED TO GET INMATE COLEMAN TO CEASE HIS
> DISORDERLY ACTIONS.  DURING THE USE OF FORCE INCIDENT,
> INMATE COLEMAN YELLED, "WAIT UNTIL I GET AHOLD [sic] OF
> YOUR NUTS, CRACKER," AS HE ATTEMPTED TO ASSAULT ME.  I
> SUSTAINED NO INJURIES FROM THE INCIDENT.

Defs' Exh. I at 46-47, DR Number 510-052628.  After a disciplinary hearing on January 26, 2006, Plaintiff was found guilty of the disciplinary report and received 60 days in disciplinary confinement.  Id. at 48.  The report is still valid and has not been expunged, or otherwise rendered invalid.

Here, based upon the record, the Court finds that there is no sufficient disagreement to require submission to a jury and that the evidence is so one-sided that Defendants must prevail as a matter of law.  Anderson, 477 U.S. at 251-252.

### A.  Excessive Force Claim: Defendants Presciti and Navarro

As set forth above, an excessive force claim is contextual and requires that many factors be considered.  These factors are referred to as the Whitley factors.  Supra at 8-9.  The Court turns first to the "extent of the injury" and notes that while this factor is not solely determinative of an Eighth Amendment claim, the Court should consider the extent of the injury as a relevant factor.  Wilkins, ____ U.S. ____, 130 S. Ct. at 1178.

### 1.  Extent of Injury

According to the Complaint, as a result of the incident, Plaintiff lost one lower incisor tooth, lost all feeling in his left arm, and bruised his ribs.  Complaint at 4; Response at 4 (citing Pl's Exh. A, Plaintiff Depo. at 56-61, 68)(stating Plaintiff lost a tooth and lost feeling in his left arm). Plaintiff also alleges in his Complaint that he was denied medical treatment.  Complaint at 4.

Defendants submit that medical evidence supports their position that Plaintiff did not sustain any injury.  Defendants point to the post use of force medical notes, Plaintiff's subsequent relevant medical records, and the affidavit from the nurse who examined Plaintiff following the use of force and the affidavit from the DOC's director of dental services.  Plaintiff does not question the validity of these medical documents, nor does he present any medical documents to the contrary.

Consequently, the Court finds Plaintiff suffered no injuries as a result of the use of force.  The post use of force medical notes reveal that Plaintiff only had red eyes and a runny nose. Defs' Exh. E., Decl. Nurse Tomaszewski at 26. The nurse who examined Plaintiff immediately following the use of force testifies that Plaintiff did not complain of any injuries because if he had, she would have noted the injuries on the medical forms.  Id. (stating Plaintiff had no complaints after the use of force).  On

-13-

December 19, 2005, three days after the use of force Plaintiff was transferred to Desoto Correctional, and did not tell the medical department at DeSoto upon intake that he required any treatment for any medical conditions.  Defs' Exh. K at 50, Health Information Arrival Summary (checking "no" in response to whether inmate has any urgent health care needs and identifying nothing under the spot for listing medical, mental health, or dental needs).

### a) Lost Tooth

The record evidences that the bottom tooth Plaintiff claims was knocked out during the use of force could not have been knocked out from the use of force because it was already missing two years earlier.  Mot. SJ at 4 (citing Defs' Exh. N, Aff. Dentist; Defs' Exh. O).  In particular, the record contains uncontroverted medical evidence establishing that Plaintiff did not lose either bottom tooth as a result of the use of force on December 16, 2005.  During Plaintiff's deposition, Plaintiff marked the bottom, front region of his mouth (the mandibular right central incisor or mandibular right lateral incisor) as the place where he lost the tooth and permitted defense counsel to take a photograph of his face and mouth.  See Defs' Exh. P, Pl's Depo. at 3;  Defs' Exh. N at 57-58. Defendants submit an affidavit from the DOC's director of dental services, Thomas Shields, and Plaintiff's medical records establishing that Plaintiff was already missing the bottom teeth years before the use of force.  See Defs' Exh. N, Decl. Shields.

-14-

Doctor Shields attests that the DOC medical records dated July 1997 show Plaintiff had both teeth numbers 25 (mandibular right central incisor) and 26 (mandibular right lateral incisor).  Defs' Exh. N at 55-56.  When Plaintiff was released in 1998, his dental records do not mention of any type of tooth loss.  Id.  Plaintiff's was re-incarcerated in the DOC in December 2003.  During Plaintiff's dental examination at intake, medical staff documented that Plaintiff's teeth numbers 25 and 26 were missing, which are the teeth located in the region where Plaintiff purports he lost a tooth from the use of force.  Other than Plaintiff's self-serving statements in his deposition that he sustained a lost tooth as a result of the use of force, Plaintiff does not dispute the validity of the medical documents establishing that the subject tooth was missing prior to the date of the incident.  Nor does Plaintiff present any evidence to the contrary.  Therefore, the Court finds that there is no dispute of fact that Plaintiff lost a tooth as a result of the use of force on December 16, 2005, because he entered the DOC missing the bottom teeth years before.

   **b) Left Arm**

   With regard to Plaintiff's left arm, the video footage immediately following the use of force shows Plaintiff moving both of his arms while removing his contaminated clothing.  Mot. SJ at 4; see also Pl's Video.  Additionally, Plaintiff's medical records from the DOC reveal that on January 31, 2006, approximately one

month _after_ the use of force, Plaintiff went to the medical department and for the first time complained of a loss of feeling in his left arm. Plaintiff stated that the loss of feeling started at 2 p.m. _that_ _day._ _Id._ (citing Exh. M)(emphasis added). Defendants also argue that to the extent Plaintiff now claims he has "nerve damage" in his left arm, Plaintiff was shot four times in the left arm in 2007. Mot. SJ at 4 (citing Exh. P at 28-29, Exh. Q). The record contains uncontroverted medical evidence establishing that Plaintiff did not sustain a left arm injury as a result of the use of force on December 16, 2005. The video footage immediately following the use of force shows Plaintiff standing up and raising both arms to remove his clothing. _See_ Pl's Video at 7:41:48. The medical notes following the use of force do not document that Plaintiff sustained any injury to either arm, nor did Plaintiff complain about his arm hurting, or a loss of feeling. Defs' Exh. E. at 30. As documented by the DOC's medical records, Plaintiff was transferred to Dade Correctional just days later on December 19, 2005, and did not state at that time that he had any urgent medical needs, or that he was receiving treatment for any medical condition. Defs' Exh. K. Approximately one month after the use of force, Plaintiff complained of loss of feeling in his left arm and told medical staff that the feeling started that day, but he never made any reference to the cause being the use of force incident. Defs' Exh. M. Other than Plaintiff's self-serving

-16-

statements in his deposition that he sustained an injury to his left arm, Plaintiff does not dispute the validity of these medical documents, nor does he present any evidence to the contrary showing that he requested treatment for these injuries and was denied treatment. Therefore, the Court finds no dispute of fact as to whether Plaintiff sustained an injury to his left arm and determines that Plaintiff did not sustain any injury to his left arm from the use of force.

### c) Bruised Ribs

The remaining injury that Plaintiff complains of as a result of the use of force is bruised ribs. Complaint at 4. As discussed above, Defendants submit that Plaintiff sustained no injuries from the use of force. Mot. SJ at 8; Defs' Exh. E., Decl. Nurse T at 26-29; Id., Post Use of Force medical record at 30. In Plaintiff's Response, Plaintiff does not mention that he suffered bruised ribs as a result of the use of force. Response at 4 (citing Pl's Exh. A, Pl's Depo. at 57-61, 68). Nor, does Plaintiff complain about bruised ribs in the transcript of his deposition attached by Plaintiff's counsel or defense counsel. See id. Thus, Plaintiff presents no evidence whatsoever to substantiate his claim that his ribs were bruised to oppose Defendants' supported Motion for Summary Judgment. In fact, to the extent that Plaintiff may have sustained bruised ribs, it is just as likely that he injured

his ribs when he lunged in the air at Defendant Navarro and landed on the concrete floor.  See Pl's Video.

Based on the foregoing, the Court concludes that the record shows Plaintiff either experienced no injury, or at most a *de minimus* injury (red eyes, runny nose), stemming from the December 16, 2005 use of force.  The fact that Plaintiff had little injury, if any, is a factor the Court considers to find that the use of force in this case was neither malicious, nor sadistic.  Further, the medical records submitted by Defendants clearly refute Plaintiff's allegation that he was denied medical treatment after the use of force incident.   The Court will now turn to the remaining Whitley factors.

**2.   The Need for Application of Force**

Plaintiff claims that he told Defendants Presciti and Navarro that they could not borrow his wheelchair for another handicap inmate's use.[4]  Plaintiff submits that Defendants made him come out of his cell to take his wheelchair from him under the auspices of

---

[4]Defendants dispute whether Plaintiff actually requires the use of a wheelchair.  At the time of the incident, the Inspector General's Office noted that Plaintiff was diagnosed with "para-thesis" and required the use of leg braces, or use of a wheelchair for mobility.  Pl's Exh. C at 7.  Subsequent evidence, including an incident in 2007, while Plaintiff was not incarcerated, when Plaintiff ran from the officer in attempt to allude arrest and medical documentation, reveal that Plaintiff's physical condition does not require the use of a wheelchair, or leg braces for mobility.   Plaintiff presents no evidence to contradict the Defendants' evidence, other than Plaintiff's self-serving deposition testimony.  See Pl's Exh. A at 1-3.

conducting a search.   Complaint at 3; Response at 3.   Plaintiff acknowledges that he "reached out and grabbed the wheelchair" in order to keep from losing it and fell to the floor.   Response at 3. Plaintiff then claims Defendants Presciti and Navarro began kicking and punching him for an unspecified period of time before using chemical agents on his face.   Defs' Exh. P, Pl's Depo. at 16, 20-25.

Defendants Presciti and Navarro submit that they were conducting showers in the G-dorm, quad 1, and Plaintiff agreed to let them borrow his wheelchair for the other inmate.   <u>See</u> <u>generally</u> Defs' Exh. A (including Report of Force Used Form, Worksheet, Incident Reports from each officer and responding correctional officers; Defs' Exh. B, Decl. Presciti at 16-18.[5]   Defendants submit that when Defendant Navarro began to push the wheelchair away, the Plaintiff lunged toward Officer Navarro and toward the wheelchair, grabbing the right wheel of the wheelchair with this left hand.   Mot. SJ at 2.   Officer Presciti immediately reacted by taking hold of Plaintiff with his arms around Plaintiff's chest, but Plaintiff continued to resist.   <u>Id.</u>   At this point, Plaintiff released his grasp on the wheelchair and attempted to grab Defendant Presciti's crotch area, stating, "'Wait until I get a hold of your nuts, cracker.'"   <u>Id.</u>   At this time, Defendants submit

---

[5]Defendants submitted a supplemental Declaration for Defendant Presciti with his signature.   <u>See</u> Doc. #123-1.

that Presciti applied two, one second bursts of chemical agents to Plaintiff's face, causing Plaintiff to cease his aggressive behavior. <u>Id.</u>

The Court finds that the fixed-wing video footage confirms that the incidents giving rise to Plaintiff's claim occurred spontaneously in response to Plaintiff, an inmate, lunging toward a correctional officer and continuing to resist their authority. The videotape evidence clearly shows Plaintiff lunging or diving toward Defendant Navarro while Navarro's back was turned away from the Plaintiff. <u>See</u> Pl's Video. Plaintiff's characterization of this event (reaching out and grabbing) is clearly contradicted by the unobstructed videotape footage and the Court accepts the video's depiction over Plaintiff's account of the facts. <u>Pourmoghani</u>, 624 F.3d at 1315. Whether or not Plaintiff had a prior history with these officers,[6] whether or not Plaintiff legitimately required the use of the wheelchair, and whether

---

[6]Plaintiff recites contradicting facts. In his Complaint, Plaintiff alleges that prior to December 2005, "Plaintiff incurred the anger" of Presciti and Navarro by writing unspecified grievances. Complaint at 3. Plaintiff claims that the officers told Plaintiff they would "get even with him" and that Navarro called Plaintiff a bad name. <u>Id.</u> Plaintiff does not, however, specify the time period when these remarks were made, or when he filed the grievances. <u>See</u> Pl's Exh. A, Plaintiff's Depo. at 8-9 (stating "Shoot, they [the grievances] was going like back, back.") In his deposition testimony, Plaintiff also avers that Defendants did not like him because he was suppose to be a witness for the State testifying against the inmates who killed a correctional officer at Charlotte Correctional. <u>See</u> Pl's Exh. A, Plaintiff's Depo. at 6.

Plaintiff permitted, or did not permit, Defendants the use of Plaintiff's wheelchair are not material to the issue of whether force was necessary in this situation.  The record unequivocally shows that Plaintiff precipitated the need for the use of force by his lunging toward a correctional officer, Defendant Navarro and holding onto the wheelchair, and his continuing to struggle with Defendant Presciti, thereby resulting in the need to use force without contradiction.  Indeed, as evidenced by the overwhelming record evidence, the force used in this case was applied in good faith and done to protect the correctional officers and restore order.

### 3.  Remaining **Whitley** factors

Plaintiff claims Defendant Presciti hit Plaintiff in the face with his fist and Defendant Navarro punched Plaintiff repeatedly in the ribs.  Complaint at 3-4.  Plaintiff also alleges Defendant Presciti continued to beat him and sprayed him in the face with chemical agents, after he released his grip on the wheelchair and was not resisting the officers.  Id. at 4.  Plaintiff points to the Department of Correction's Inspector General's ("IG") report and reprimand of Defendant Presciti based on his use of chemical agents in this incident.  The IG report found that Defendant Presciti applied chemical agents "unnecessarily" in violation of DOC policy because of Plaintiff's paralysis and suggests that because Navarro had already removed the wheelchair, the chemical agents were

"unnecessary."   Plaintiff also claims that Navarro squeezed and twisted Plaintiff's cuffed arms behind his back until Plaintiff's left arm had lost all feeling.   Id.   Based on these reasons, Plaintiff claims the force used was excessive.   Id.

Defendants submit that the force they applied to Plaintiff was not excessive. Defendants point out that Plaintiff does not have a medical condition requiring the use of a wheelchair, nor has Plaintiff submitted any evidence substantiating such a need.  Reply at 1-2.   Therefore, Defendants argue that the IG's finding that Officer Presciti's application of chemical agents was unnecessary is invalid because it erroneously concludes that Plaintiff had a medical condition and had relinquished control of the wheelchair at the time chemical agents were applied.   Id.   Defendant Presciti admits that he struck Plaintiff's left forearm with his right hand in attempt to break Plaintiff's grasp of the wheelchair.   Mot. SJ at 2.   Defendants Presciti and Navarro state that Plaintiff released the wheelchair and attempted to grab Officer Presciti's crotch area stating, "Wait until I get a hold of your nuts, cracker."   Id.   Officer Presciti then administered two, one-second bursts of chemical agents at Plaintiff, spraying him in the face. Id.   At this point, Defendants acknowledge that Plaintiff ceased his aggressive behavior.   Id.   After getting the wheelchair out of the way, Defendant Navarro calmly walked toward Plaintiff and handcuffed Plaintiff.   Id. (citing Defs' Exh. A. at 1, 5; Defs'

Video at 7:33:33-7:34:15; Defs' Exh. B; Defs' Exh. C; Defs' Exh. D
at 14). Defendants kept Plaintiff handcuffed and restrained on the
floor, on his stomach until the other officers arrived. Id.
(citing Defs' Video at 7:34:15-7:39:18; Defs' Exh. B; Defs' Exh. C;
Defs' Exh. D at 14).

The Court finds that the incidents occurred in a continuum.
Thus, the Court need not address each specific alleged use of
force. See Velazquez v. City of Hialeah, 484 F.3d 1340, 1342 (11th
Cir. 2007). Nonetheless, in an abundance of caution the Court will
address the scuffle on the floor first, then the striking of
Plaintiff's left forearm, and lastly the use of chemical agents.

As previously stated, the incident from beginning to end was
approximately one minute in duration. Again, the Court finds that
the videotape footage contradicts Plaintiff's version of the
events.[7] The unobstructed video footage reveals absolutely no

---

[7]Based on the evidence presented, the Court takes issue with
Plaintiff's recitation of facts under his section entitled "common
allegations of fact." Plaintiff's counsel mis-characterizes
several facts based on his own evidence, and/or based on
uncontroverted evidence submitted by the Defendants. For example,
Plaintiff twice states that Officer Presciti "sprayed Cecil Coleman
in the face with chemical agents, an act for which he was later
punished as unnecessary **and excessive**." Response at 3 (emphasis
added); see also Response at 4 (stating Department of Corrections
found Presciti used "excessive force."). Presciti's reprimand,
never stated that the force he used was "excessive." Instead, the
reprimand stated that the use of chemical agents at that time was
"unnecessary." Pl's Exh. D at 1, 4, 6. Plaintiff next states that
"Douglas Coleman ordered the officers to knee Cecil Coleman.
Officer Navarro did so." Response at 4. The video shows only
two officers present during the use of force: Navarro and Presciti.
(continued...)

kicking or continued punching or beating, as described by Plaintiff. The video shows Defendant Presciti intervene on Defendant Navarro's behalf, immediately after Plaintiff lunged toward Navarro, as Navarro moves away from Plaintiff. Navarro attempts to pull the wheelchair away from Plaintiff, while

---

[7](...continued)
Plaintiff acknowledges in his deposition that Defendant Coleman was not present until after Plaintiff was handcuffed. A review of Plaintiff's deposition testimony suggests that Defendant Coleman did not tell the officer "to knee" Plaintiff, but rather how to restrain Plaintiff on the ground. Next, Plaintiff's counsel represents that "Cecil Coleman never threatened to touch either Officer . . . He never attempted to do so." Response at 4 (citing Exh. B, Fixed Wing Video Recording. Exh. C. Presciti Reprimand). The fixed-wing video, to which Plaintiff cites, neither confirms nor denies that anyone said anything because there is no audio. Further, as noted in this Opinion and Order, the camera angle with respect to this issue does not permit a determination as to whether Plaintiff attempted to grab Presciti's private area, or not. Counsel for Plaintiff also submits that "Coleman suffered physical injuries as a result of the officers' acts, including a lost tooth and a long-term loss of feeling in one arm." Response at 4. Counsel makes the submission that Plaintiff lost a lower, incisor tooth as a result of the use of force incident, despite review of uncontroverted medical evidence that establishes that Plaintiff entered the Department of Corrections in 2003 with his two lower teeth missing. See Complaint at 4; Defs' Exh. N (stating Plaintiff entered custody in December 2003 and was missing teeth numbers 25 and 26, which included the tooth Plaintiff identified at his deposition as the one he lost by the use of force). Finally, Plaintiff's counsel insinuates that Officer Presciti resigned as a result of this use of force. Response at 4-5 (stating "former Officer" Presciti "resigned as an officer just after a settlement in which he accepted a written reprimand in lieu of more several discipline." Plaintiff cites to Pl's Exh. C, Presciti Reprimand; Pl's Exh. D, Presciti Resignation. There is nothing in the record to suggest that Officer Presciti resigned as a result of the use of force. Instead, Presciti's resignation letter dated September 2006 (some 9 months after the incident) shows that Presciti was offered another job in Sarasota County that offered him "greater compensation." Pl's Exh. D, Presciti Resignation.

Defendant Presciti drops down to the floor with Plaintiff in attempt to gain control of Plaintiff. See Pl's Video.

The videotape supports Defendant Presciti's version of the events that Presciti struck Plaintiff's left forearm with his right hand in attempt to break Plaintiff's grasp on the wheelchair. See Pl's video at 7:33:48 (showing Presciti's right arm lift swiftly back and move forward toward Plaintiff). The video then shows Presciti struggling to gain control of Plaintiff whose arms and head are turned forward, toward Prescitti's groin area. Finally, the video shows Presciti reach for his chemical agents on his waist and apply them to Plaintiff's facial area. Id. While it is not possible to tell the length of time the chemical agents were applied by viewing the video footage, Defendant Presciti submits that two, one-second bursts of agents were applied to Plaintiff's facial area, and Plaintiff presents no evidence to dispute this fact. The videotape confirms that the use of force ended as soon as Plaintiff stopped resisting Presciti and remained subdued on the floor until other officers arrived. The video reveals no upper or lower body movements by Presciti or Navarro during this time period while the officers restrain Plaintiff on the floor. See Pl's Video.

On the video, Defendant Navarro is no where near the proximity of Plaintiff's body during this one minute period and therefore it is not plausible, or even possible, that he could have punched

-25-

Plaintiff in the ribs or kicked him.  The video footage shows that Defendant Navarro only approaches Plaintiff's body to handcuff him and to help Presciti keep Plaintiff restrained on the ground until the other officers arrived.  The video footage refutes that Navarro was twisting Plaintiff's handcuffed arms behind his back, as described by Plaintiff.

With respect to any words exchanged during the one minute use of force, or during the three minute delay until other officers arrived, the video does not have audio, so it is not possible to confirm or deny the Defendants' allegations that Plaintiff told the officers he was going to grab Presicti's genitalia.  See Defs' Exh. B, Decl. Presciti at 16;  Defs' Exh. C, Decl. Navarro at 19. Indeed, it is also not possible to tell whether Plaintiff reached toward Presciti's private area.  However, as noted earlier, the video is consistent with this allegation as it shows that Plaintiff's upper body and face are near that area of Presciti's body as Presciti  was on the floor trying to subdue Plaintiff.

Although the IG's office found Defendant Presciti's use of chemical agents was "unnecessary" and violated the DOC's policy, a violation of DOC policy does not necessarily amount to a violation of the United States Constitution.  Dolihite v. Maughon By and Through Videon, 74 F.3d 1027, 1055 (11th Cir. 1996).  Moreover, assuming arguendo that the continued use of force by Defendant Presciti, i.e. the use of two, one-second bursts of chemical

-26-

agents, was *unnecessary* at that point in time, it was not excessive or harmful to Plaintiff.  The use of mace or pepper spray is an accepted non-lethal means of controlling unruly inmates.  Danley v. Allen, 540 F.3d 1298, 1307 (11th Cir. 2008)(citations omitted). Considering the escalating continuum of events and the short duration of the entire episode, the Court concludes that the question of whether Defendant Presciti applied the chemical agents while Plaintiff was continuing to resist authority or immediately after "he stopped resisting" is not a material issue of fact.  The Court must look at the "totality of the circumstances: not just a small slice of the acts that happened at the tail of the story." Garrett v. Athens-Clarke County, Ga., 378 F.3d 1274, 1281 (11th Cir. 2004).

In this case, the video clearly depicts Plaintiff being unruly as he lunged toward Defendant Navarro and continuing to scuffle with Defendant Presciti on the floor.  Plaintiff's actions posed a risk to security at Charlotte Correctional and a risk to the correctional officers' lives.  Thus, the use of force was not malicious or sadistic and was spontaneously done to restore order. Moreover, this Court is not to second-guess the judgment of prison administrators who have to undergo the pressure of maintaining institutional security.  "The management by a few guards of large numbers of prisoners, not usually the most gentle and tractable of men and women, may require and justify the occasional use of a

degree of intentional force."  Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990).  Only Defendant Presciti was near Plaintiff when he administered the chemical agents and both officers submit that Plaintiff threatened to grab a part of Presciti's genitalia. Thus, the Court finds a reasonable officer in Presciti's position could have perceived a reasonable threat based on Plaintiff's actions and behavior.  After the application of chemical agents, Plaintiff showered and went to the medical department for an examination, thereby further evidencing that the force was neither malicious nor sadistic.

## B.  Failure to Intervene

### 1.  Defendants Presciti and Navarro

Plaintiff also attributes liability on Defendants Presciti and Navarro for failure to intervene while the other officer used excessive force on Plaintiff.  Complaint at 4, ¶ 31-32.

If the Court finds a constitutional violation based on the excessive use of force, "'an officer who [was] present at the scene and who fail[ed] to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.'"  Velazquez, 484 F.3d at 1341 (citing Skrtich v. Thornton, 280 F.3d 1295, 1302 (11th Cir. 2002))(other citations omitted).  "This liability, however, only arises when the officer is in a position to intervene and fails to do so."  Priester v.

City of Riviera Beach, Fla., 208 F.3d 919, 924 (11th Cir. 2000) (citing Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998)).

Given the totality of the circumstances and the rapid succession of the events, nothing in the record suggests that Defendants Presciti or Navarro had an opportunity to intervene and yet failed to do so. See Priester, 208 F.3d at 927 (determining that an officer was liable for failing to intervene based on the fact that he "had the time and ability to intervene" and did not do so). Indeed, Plaintiff states only that the Defendants were "physically present."[8] See Complaint at 4. However, this vague assertion is insufficient to suggest that the officers would have had sufficient time to intervene based on the suddenness of the incident. See Russ v. Ratliff, 538 F.2d 799, 805 (8th Cir. 1976). Thus, to the extent Plaintiff predicates his claims against Defendants Presciti or Navarro upon their failure to intervene, his claims must also fail.

### 2.  Sergeant Coleman

Plaintiff attributes liability on Defendant Sergeant Coleman as the supervisor. See Complaint at 4. Plaintiff alleges "Defendant Coleman, as supervising officer, orchestrated the attack on Plaintiff and although he had the ability to intervene to stop the attack, failed to do so." Id. at 4, ¶33. Specifically,

---

[8]Further, according to the Complaint, both officers were attacking the Plaintiff at the same time, making it impossible for either one to intervene.

Plaintiff states that Sergeant Coleman warned Plaintiff over the intercom that he better give up his wheelchair.  Response at 2 (citing Pl's Exh. A, Plaintiff's Depo. at 49).  Plaintiff submits that Defendant Coleman "ordered the officers to knee Cecil Coleman" and Navarro did so.  Id. at 4 (citing Pl's Exh. A, Plaintiff's Depo. at 65, 67); see also Pl's Exh. A at 67.

Defendant Coleman moves for summary judgment and submits he was not present when the use of force occurred, did not witness the use of force, and did not encourage the officers to use force during this incident.  Mot. SJ at 3 (citing Video; Def's Exh. F, Depo. Sgt. Coleman at 9-10, 17, 30-31; Defs' Exh. G, Decl. Sgt Coleman; Defs' Exh. H, Decl. Kozlowski).

The standard by which a supervisor is held liable in his individual capacity for the actions of a subordinate is extremely rigorous.  Hicks v. Moore, 422 F.3d 1246 (11th Cir. 2005). Supervisors can be held personally liable when either (1) the supervisor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation.  Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988)(per curiam).  The causal connection can be established by showing: (1) that the supervisor knew about and failed to correct a widespread history of abuse; (2) had a custom or policy resulted in the constitutional violation; or, (3) that the facts support an inference that the

supervisor directed the subordinates to act unlawfully, or knew that the subordinates would act unlawfully and failed to stop them from doing so.  Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).

Based on the reasons discussed above, the Court finds that Defendant Sergeant Coleman is entitled to the entry of summary judgment as a matter of law.  The record establishes no causal connection between Defendant Coleman and the use of force. Sergeant Coleman was in a different wing at Charlotte Correctional when the use of force occurred and Officer Kozlowski, who was in the control room, alerted Defendant Coleman about the use of force. Defs' Exh. F, Depo. Sgt. Coleman at 34; see also Defs' Exh. H, Decl. Kozlowski at 44-45.  The video footage confirms that Defendant Coleman was not present when the use of force occurred, only Defendants Presciti and Navarro were present. See Pl's Video. Therefore, it is not plausible, or even possible, for Defendant Coleman to have "orchestrated" the use of force, or to have encouraged Defendants Presciti and Navarro to knee the Plaintiff because the record shows Defendant Coleman was not present when the use of force occurred.  See supra at 25-26; see Pl's Video.

In his sworn declaration, Defendant Coleman states that when he arrived back in quad 1 where Plaintiff was housed, the Plaintiff was already back in his cell.  Id. at 34, 38-39; see also Defs' Exh. G, Decl. Sgt. Coleman at 42.  Defendant Coleman further states

that had he been in the control booth, as alleged by Plaintiff, and not responded to the incident, he would have been reprimanded. Defs' Exh. F at 38-39.  Defendant Coleman received no reprimand. Plaintiff in fact acknowledges that he did not see Defendant Coleman until <u>after</u> the use of force concluded when he was in handcuffs, and at that point, he saw Defendant Coleman with the officer holding the hand held recorder.[9]   <u>See</u> Pl's Exh. A, Plaintiff Depo. at 33.  Plaintiff further states that he did not hear Defendant Coleman say anything.  <u>See</u> Pl's Exh. A at 35, 36 (stating "He didn't say nothing. He didn't say nothing.").

With respect to the failure to intervene claim against Defendant Coleman, Defendant is also entitled to summary judgment because the record establishes excessive force was not used and he was not present when force was used on Plaintiff. <u>Velazquez</u>, 484 F.3d at 1341 (citing <u>Skrtich v. Thornton</u>, 280 F.3d 1295, 1302 (11th Cir. 2002))(other citations omitted).  "This liability, however, only arises when the officer is in a position to intervene and fails to do so." <u>Priester v. City of Riviera Beach, Fla.</u>, 208 F.3d 919, 924 (11th Cir. 2000) (citing <u>Ensley v. Soper</u>, 142 F.3d 1402, 1407 (11th Cir. 1998)). Defendant Coleman was not in the position to intervene. <u>See</u> Pl's Exh. A, Plaintiff's Depo. at 33 (stating Defendant Coleman did not arrive until he was in handcuffs).  Thus,

_____

[9]Elsewhere in Plaintiff's deposition, Plaintiff avers that he saw Defendant Coleman in the control room, thus Plaintiff's deposition contains contradictions with respect to this fact.

to the extent Plaintiff predicates his claims against Defendant Coleman upon his failure to stop Defendants Navarro and Presiciti, his claims must fail.

In determining whether to grant summary judgment, the Eleventh Circuit Court of Appeals has instructed:

> courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a *reliable inference of wantonness in the inflicting of pain* . . . , the case should not go to the jury.

Campbell, 169 F.3d at 1375 (citing Whitley, 475 U.S. at 322 (emphasis added)). Viewing the facts in the light most favorable to Plaintiff, the record fails to support any inference of wantonness in the infliction of pain by any of the Defendants. Thus, for the foregoing reasons, the Court finds that the record does not contain any issues of material fact as to whether Defendants Presciti and Navarro applied excessive force on Plaintiff in violation of the Eighth Amendment. As such, the Court finds that Defendants Presciti, Navarro, and Coleman are entitled to judgment as a matter of law on all claims.

### C. Qualified Immunity

Defendants assert that they are entitled to qualified immunity because they were acting pursuant to the performance of their duties as correctional offices. Mot. SJ at 10. Because the Court finds that no genuine issues of material fact remain concerning

Defendants' use of force on Plaintiff, it is not necessary to discuss whether the Defendants are entitled to qualified immunity.

ACCORDINGLY, it is hereby

**ORDERED**:

1.   Defendants' Motion for Summary Judgment (Doc. #122) is **GRANTED** for the reasons set forth herein.

2.   All deadlines are terminated and any motions related thereto are **DENIED as moot.**

3.   The **Clerk of Court** shall terminate any pending motion, enter judgment accordingly, and close this case.

**DONE AND ORDERED** at Fort Myers, Florida, on this ___7th___ day of November, 2011.

JOHN E. STEELE
United States District Judge

SA: alj
Copies: All Parties of Record